1

2

3

4

5

6

7

**UNITED STATES DISTRICT COURT**

8

EASTERN DISTRICT OF CALIFORNIA

9

10

GLENN LEROY JOHNSON,

Plaintiff,

11

v.

12

CAROLYN W. COLVIN,

Acting Commissioner of Social Security,

13

Defendant.

14

Case No.  1:15-cv-00528-SKO

**ORDER ON PLAINTIFF'S SOCIAL SECURITY APPEAL**

15

16

## I.    INTRODUCTION

17

Plaintiff Glenn Leroy Johnson ("Plaintiff") seeks judicial review of a final decision of the

18

Commissioner of Social Security (the "Commissioner") denying his application for Disability

19

Insurance Benefits ("DIB") benefits pursuant to Title II of the Social Security Act.

20

42 U.S.C. § 405(g).  The matter is currently before the Court on the parties' briefs, which were

21

submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate

22

Judge.[1]

23

## II.    FACTUAL BACKGROUND

24

Plaintiff was found disabled as of April 1, 2004, in an agency determination on August 17,

25

2004.  (Administrative Record ("AR") 20.)  On November 19, 2010, it was determined Plaintiff

26

was no longer disabled as of November 1, 2010.  (AR 20.)  Plaintiff requested a hearing to dispute

27

the determination, alleging he remained disabled due to paranoid schizophrenia, intermittent

28

---

[1]    The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 8, 9.)

explosivity disorder, post-traumatic stress disorder, attention deficit disorder, anti-social personality disorder, and cognitive disorder.  (AR 94; 305-09.)

Plaintiff was born on October 20, 1963.  (AR 29.)  He was diagnosed with attention deficit hyperactivity disorder (ADHD) when he was 5 years old.  (AR 404; 445.)  Plaintiff was in special education courses while in school, was observed to be agitated and disruptive, had attention problems, and made "rage attacks" on other students.  (AR 404.)  Plaintiff eventually graduated from high school and took some college level athletic courses.  (AR 62, 404-06.)  As an adult, Plaintiff was jailed and incarcerated several times for incidents of assault, including spousal abuse.  (AR 405.)  He worked as a janitor and an auto mechanic.  (AR 405; 512.)  In 1996, Plaintiff was prescribed medical marijuana.  (AR 445; 489; 519; 552.)

Plaintiff's was terminated from his last job as an auto mechanic when he assaulted his supervisor.  (AR 406.)  Plaintiff was incarcerated in the Vacaville Prison Hospital until 2003, when he was released on parole.  (AR 437; 446; 512; 519.)  In 2007, Plaintiff was injured in an auto accident, and has lived with his grandfather under the care of a caretaker ever since.  (AR 445; 519; 524.)  In March 2010, Plaintiff assaulted someone who came onto the grandfather's property because he feared he and his grandfather were being attacked.  No charges were filed.  (AR 445; 524; 533.)

Plaintiff was found disabled as of April 2004 because his mental impairment met Listing 12.04.  (AR 75-76; 412; 415; 422.)  After an anonymous complaint in 2010, however, the Cooperative Disability Investigations unit (CDI) investigated allegations that Plaintiff was no longer disabled and his SSI was terminated as of November 2, 2010.  (AR 80; 90; 126; 350-54.)

A.     **Relevant Medical Background[2]**

On July 24, 2004, board-certified psychiatrist Dr. Bradley Daigle, M.D., examined Plaintiff at the request of the state agency.  (AR 404-09.)  Plaintiff had not taken psychotropic medication for the previous 15 years because he believed it was "poison," but was being treated

---

[2]     Although Plaintiff's cessation date is the relevant date in this case, medical evidence from before and after November 1, 2010, is summarized below because it is relevant to whether Plaintiff's experienced medical improvement as of his cessation date.  *See McNabb v. Barnhart*, 340 F.3d 943, 945 (9th Cir. 2003).

under the care of a counselor at "Angel's Camp." (AR 405.)  Plaintiff was prescribed Vistaril for sleep and marijuana for control and relaxation. (AR 405; 408.)  Plaintiff reported the most success with medical marijuana, and told Dr. Daigle that he did not go out without smoking marijuana first. (AR 405.)  Plaintiff also reported problems with his neck, shoulders, and hips. (AR 405.)

Dr. Daigle noted Plaintiff was "alert, oriented and superficially compliant, but [also] sat stone-faced and rigidly with very limited responsiveness, and had a rather threatening penetrating gaze throughout the interview." (AR 406.)  Dr. Daigle observed that he felt Plaintiff "could be easily provoked." (AR 406.)  Plaintiff had "coherent and organized" thought processes with "no tangentiality or loosening of associations," "relevant and non-delusional" thought content, and "tense and watchful" mood with a "generally passively and pervasively hostile" affect. (AR 407.)  Plaintiff denied recent auditory or visual hallucinations. (AR 407.)

Plaintiff appeared to be of average intelligence, with fair concentration and calculation and limited insight and judgment. (AR 407-08.)  Dr. Daigle diagnosed Plaintiff with intermittent explosive disorder and ADHD, and opined Plaintiff was "markedly limited" in his ability to relate and interact with supervisors, co-workers and the public; "moderately to markedly limited" in his ability to associate with day-to-day activity, including attendance and safety, and in his ability to adapt to stresses common in the normal work environment; "moderately limited" in his ability to maintain concentration and attention, persistence and pace; "very slightly" limited in his ability to understand, remember, and carry out simple one or two-step job instructions; and "slightly limited" in his ability to follow detailed and complex instructions. (AR 409.)  Dr. Daigle opined that, from a psychiatric standpoint, Plaintiff's prognosis over the next twelve months was "poor." (AR 409.)

On August 12, 2004, state agency psychiatrist Dr. Evelyn Aquino-Caro, M.D., opined that Plaintiff met Listing 12.08 (Personality Disorders) and Listing 12.04 (Affective Disorders). (AR 411; 422.)  Plaintiff reported smoking marijuana every night for his anxiety, and went to the hospital at least once for a panic attack in August 2005. (AR 491; 499.)

//

On October 16, 2007, Plaintiff sustained injuries in an automobile accident.  (AR 431-34 (aftercare records from Mark Twain St. Joseph's Hospital).)   On February 23, 2008, Plaintiff reported ongoing right elbow pain.  (Tr. 430.)  On August 6, 2008, Plaintiff reported experiencing ongoing neck, back, and left foot pain since his accident, and radiological imaging of his left foot revealed "an acute osseous, joint or soft tissue abnormality."  (AR 429; 436.)

On July 21, 2010, Dr. Brock Kolby, Ed.D, evaluated Plaintiff for mental health services to determine whether Plaintiff would remain out of prison.  (AR 524-25.)  Dr. Kolby diagnosed Plaintiff with intermittent explosive disorder, cannabis dependence, and antisocial personality disorder.   (AR 519-24.)   After Plaintiff declined medications and group therapy, Dr. Kolby referred Plaintiff to Angel's Camp for individual therapy.  (AR 524.)

On October 2, 2010, board-certified psychiatrist Dr. Manolito Castillo, M.D., examined Plaintiff at the request of the state agency.  (AR 445-48.)  Plaintiff's caretaker Tiffany Westfall drove Plaintiff to his appointment and provided Dr. Castillo with historical information. (AR 445.)  Dr. Castillo observed Plaintiff's social interaction was poor and that Plaintiff made numerous errors on testing for orientation, attention, memory, abstraction, and judgment. (AR 446-47.)  Dr. Castillo opined he was unable to diagnose bipolar disorder or schizophrenia because of Plaintiff's marijuana use; diagnosed Plaintiff with mood disorder, psychotic disorder, and cannabis dependence; and predicted Plaintiff's symptoms would resolve if properly treated. (AR 447.)  Dr. Castillo further opined that Plaintiff had marked limitations in his ability to perform detailed and complex tasks; marked limitations in his ability to concentrate in two-hour blocks of time; and was not capable of handling his own funds.  (AR 447.)

On November 18, 2010, state agency reviewing physician Dr. G. Ikawa, M.D., completed a psychiatric review technique form, reporting that there was insufficient evidence to make a medical disposition. (AR 449-59.) Dr. Ikawa affirmed the investigator's notes that it was difficult "to tell fact from fiction" in Plaintiff's file and recommended cessation of benefits because "despite all attempts to get sufficient evidence, we lack sufficient evidence given all of the conflicts in file." (AR 461.)

//

4

On December 20, 2010, Plaintiff sought care for a 10-day exacerbation of back pain. (AR 477.) Radiological imaging of Plaintiff's lumbosacral spine was ordered and physical therapy was recommended depending on the results which are not in the record. (AR 478.) On January 5, 2011, Plaintiff asked Dr. Kolby to evaluate him for treatment with medications. (AR 519.) Dr. Kolby examined Plaintiff and diagnosed Plaintiff with post-traumatic stress disorder, intermittent explosive disorder, antisocial personality disorder, and "cannabis abuse in early partial remission." (AR 517; 526-29.) Dr. Kolby assigned Plaintiff a GAF[3] score of 45, recommended medication services, and advised Plaintiff to continue therapy with Angel's Camp. (AR 520.)

On February 18, 2011, Dr. Robert Mulert, M.D., saw Plaintiff for an initial psychiatric evaluation. (AR 512.) Plaintiff was accompanied by his caretaker, who reported that Plaintiff had short-term memory deficits that began with his 2007 head injury. (AR 512.) Plaintiff reported ceasing use of marijuana, and Dr. Mulert opined that Plaintiff's risk factors were his psychosis, cognitive impairment, and low standard of living. (AR 513.) Plaintiff scored 17 out of a possible 30 on the "mini mental status examination," with dysphoric affect, absent eye contact, impaired insight and judgment, and "very weak" cognition. (AR 512-513.) Plaintiff was "essentially noncommunicative," unable to register and recall information, and was not oriented to time and place. (AR 513.) Plaintiff reported "a fear, a paranoia that the people in prison are going to come back and chain him and take him away," sleeping in the closet at night "so that they cannot find him and take him back to prison," endorsed auditory hallucinations, and stated that he communicated with animals, including a chicken he takes care of that "gives him instructions on what he should do." (AR 512.) During the evaluation, Plaintiff stared at the floor and answered most questions with a yes or no and one or two-word answers. (AR 513.) Dr. Mulert diagnosed Plaintiff with paranoid type schizophrenia, intermittent explosive disorder, antisocial personality traits, and traumatic brain injury with marked cognitive impairment, and assigned Plaintiff a GAF score of 40. (AR 513.) Dr. Mulert prescribed Risperidone to address Plaintiff's psychosis. (AR 513.)

---

[3]   Global Assessment of Functioning (GAF) scale score is a numeric scale (1 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults. Diagnostic and Statistical Manual of Mental Disorders IV, American Psychiatric Association (4th ed. 2000) at 34.

On March 1, 2011, Plaintiff reported improvement with Risperidone, stating that he heard fewer voices and experienced less paranoia.  (AR 510.)  Plaintiff's caregiver reported Plaintiff was doing better and taking better care of himself, and Dr. Mulert observed Plaintiff's affect was "more animated" and his eye contact had improved.  (AR 510.)  Dr. Mulert assessed Plaintiff with a GAF score of 40 and opined that medication efficacy was "partial."  (AR 510.)

On May 3, 2011, consultative psychologist Dr. James A. Wakefield, Jr., Ph.D., saw Plaintiff for a "psychodiagnostic evaluation" at the request of the agency to assess Plaintiff's intellectual functioning.   (AR 532-37.)   Plaintiff reported taking Risperidone and told Dr. Wakefield it "works OK, sometimes." (AR 533.)  Testing for intelligence and memory revealed significant deficiencies, including a "deficient" full-scale IQ score of 45, but Dr. Wakefield opined the score "dramatically underestimates [Plaintiff's] actual ability."   (AR 534-35.)   Plaintiff's verbal comprehension, perceptual reasoning, working memory, and processing speed were all presented as deficient for his age. (AR 535.)  Results of perceptual-motor development test were "at least as strong as the borderline range," and Plaintiff's results for the Test Of Memory Malingering were "far into the range [ ] associated with malingering," (AR 533; 536.)

Dr. Wakefield opined Plaintiff's "intellectual ability could not be adequately assessed due to malingering" and that Plaintiff's malingering "may have obscured a genuine disability."  (AR 536.)  Dr. Wakefield further opined Plaintiff "does not appear to have an organic mental disorder or a psychotic disorder."  (AR 536.)  Dr. Wakefield opined Plaintiff is unable to handle his own funds and that

> . . . he can follow simple repetitive tasks, although his ability to follow more complex procedures could not be assessed due to malingering.  [Plaintiff] is able to interact with co-workers, supervisors, and the public acceptably.  He is able to sit, stand, walk, move, lift, carry, handle objects, hear, speak, and travel adequately.  [Plaintiff]'s ability to reason and make occupational, personal, and social decisions in his best interests is presented as deficient, although stronger ability is suspected.  His social and behavioral functioning during the session were appropriate (except for malingering).  [Plaintiff]'s concentration and pace are presented as deficient.  His persistence is adequate.

(AR 537.)  Dr. Wakefield was also unable to assess a GAF score due to malingering.  (AR 537.)

//

On July 13, 2011, state agency psychiatrist Dr. V. Meenasshi, M.D., completed a psychiatric review technique form.  (AR 538-48.)  Dr. Meenasshi opined there was "insufficient evidence" for a medical disposition and that, because of the inconsistent record, an "informed adjudication" could not be made.  (AR 538; 548.)  Dr. Meenasshi further opined Plaintiff had mild restrictions in his activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace, and that there was "insufficient evidence" of repeated episodes of decompensation, each of extended duration.  (AR 546.)

Dr. Mulert's office completed client treatment plans on December 12 and 28, 2011, to map out treatment for Plaintiff's history of schizophrenia and trauma.  (AR 571-72.)  On December 11, 2012, Dr. Mulert observed Plaintiff's affect was flat and restricted; he had poverty of speech and thought; and his cognition, insight, and judgment were impaired.  (AR 573.)  Plaintiff's caregiver reported that Plaintiff's medication adherence was good with no reported adverse side effects, and that medication efficacy was good.  (AR 573.)  Dr. Mulert diagnosed Plaintiff with schizophrenia, paranoid type, intermittent explosive disorder, antisocial personality disorder, and traumatic brain injury, and assigned Plaintiff a GAF score of 39.  (AR 573.)

On September 13, 2013, Dr. Mulert completed a psychiatric medical source statement. (AR 575.)  The form defined "marked" as causing "considerable impact throughout workday" and "extreme" causing "almost constant impact on work or total limitations."  (AR 575.)  Dr. Mulert opined Plaintiff had "marked" limitations in his ability to relate and interact with supervisors and co-workers, and had "extreme" limitations in his ability to understand, remember, and carry out simple one-or-two step job instructions; deal with the public; maintain concentration for at least two-hour increments; and withstand the stress and pressures associated with working an eight-hour workday and day-to-day work activity.  (AR 575.)  Dr. Mulert further opined Plaintiff's ability to handle funds was "poor" and that the expected "duration and prognosis" of his impairments was "long term."  (AR 575.)

**B.      Plaintiff's Self-Reports and Agency Investigative Interviews**

On March 23, 2010, the agency received an anonymous call reporting Plaintiff had received $1,000 from his attorney for an October 2007 car accident and would receive another

$1,000, owned property in Belize, and bought and sold things on Craigslist.  (AR 368.)  The caller also reported that Plaintiff was planning to fly to Equador on April 6, 2010.  (AR 368.)  When questioned in person on April 28, 2010, Plaintiff admitted he had flown to Equador, but denied receiving an insurance settlement, owning any property in or out of the U.S., and selling things on Ebay or Craigslist.  (AR 368.)  The interviewer noted Plaintiff was "very evasive during the interview" and did not make eye contact.  (AR 369.)  On October 2, 2010, a surveilling investigator noted Plaintiff engaged in conversation and was smiling, made normal eye contact, and "offered verbal assistance which appeared to be a normal reaction by a person aware of his surroundings and situation."  (AR 352.)  On October 14, 2010, an investigator interviewed Plaintiff and noted that while Plaintiff "sometimes speaks slowly and stutters," he appeared to be alert and aware of his surroundings.  (AR 354.)  The investigator further observed that Plaintiff "kept his head down and at times mumbled his words and provided vague responses," was "not friendly," and avoided eye contact.  (AR 354.)

On July 7, 2010, Plaintiff completed an adult function report form and reported that he lived with his grandfather and spent his days waiting for his caretaker to "make us sum food," watching TV until dinner, and going to bed.  (AR 285.)  Plaintiff's mother visited him, and Plaintiff went for walks with his grandfather and his caretaker.  (AR 285.)  After his dog died, Plaintiff cut off its head and hung the head on his wall to use as a hat holder.  (AR 286.)  Plaintiff does not cook because his memory problems cause him to burn everything, and does not do chores or go grocery shopping.  (AR 287-88.)  Plaintiff plays checkers, cards and dice with his grandfather, who often beat him.  (AR 289.)

Plaintiff is unable to "remember much" and "fight[s] with everyone."  (AR 290.)  When asked how well he got along with authority figures, Plaintiff responded that "[c]ops beat people up I hate them All bosses are mean Don't like them" and that "I don't like most anyone and prison did not help."  (AR 291-92.)  Plaintiff was fired from his last job because he "tr[i]ed to kill [his] last boss" and does not handle stress or changes in routine well.  (AR 291.)  Plaintiff reported having a prescription for cane, which he uses as a weapon against dogs when was walking.  (AR 291.)

On November 2, 2010, Plaintiff submitted a supplemental statement that he cannot work and has no ability to support himself.  (AR 301-02.)  Plaintiff stated that he has "problems real bad with everything I do" and no longer drinks alcohol or uses drugs.  (AR 301.)  Plaintiff states that he is a "crazzy (*sic*) man that should stay home for the better of ever[y]one."  (AR 301.)  Plaintiff is "ok" if he takes his medications, "get[s] [his] SSI help," and is "at home [because] you can't put [him] with others."  (AR 301.)  Plaintiff "just want[s] to stay at home and stay out of trouble" and "can not work without hurting people."  (AR 302.)

**C.     Hearing Testimony**

**1.     Plaintiff's Testimony at Hearing**

Plaintiff testified that his caretaker remembered his medications for him, took him to his appointments, and tried to keep him out of jail.  (AR 56.)  Plaintiff had just been released from jail a few days prior, and had called into the hearing from his living room.  (AR 49; 53 (Plaintiff was in jail for 15 days as a result of "being mean to somebody")).)  He had been incarcerated 23 times for altercations related to his violent temper.  (AR 59.)  Mostly Plaintiff went to jail for "yelling and screaming," but sometimes these fights were physical.  (AR 59.)  Plaintiff had been jailed most recently after getting into a fight with someone for calling him "a retard."  (AR 53; 60.)  He has to be put in a cell by himself and given medication.  (AR 60-61.)  Plaintiff testified that he never does illegal drugs or drinks alcohol in excess.  (AR 55.)

Plaintiff has some odd speech mannerisms due to being "a bit challenged" and "slow[ed] down a bit" by his medications.  (AR 54.)  Plaintiff "can walk and do things, and think and walk and move [his] dog and stuff and feed [his] animals, but [his caretaker] helps [him] with lots of things.  (AR 56.)  Plaintiff has a driver's license and drives when his caretakers "let" him.  (AR 56.)

Plaintiff takes medication for paranoid schizophrenia and experiences auditory hallucinations.  (AR 58.)  He testified that "[s]ometimes when [he's] sleeping monsters chase [him]" so he used to go outside and hide in the doghouse because it's "safer."  (AR 58.)  Since his caretaker Tiffany moved in and he began taking his medications, however, he feels better.  (AR 58.)  Plaintiff continues to have nightmares but "it's okay if I take a lot of my medicine."

1   (AR 63.)  Plaintiff sometimes sleeps until noon when he is unable to sleep the night before due to

2   nightmares, missing his medication, or taking the wrong dosage of medication.  (AR 63.)

3       Plaintiff testified that he had gotten worse after being hit by a drunk driver in 2007.

4   (AR 58; 62).  Plaintiff testified he cannot focus on things for very long, reporting that he had been

5   unable to change someone's tire a few days previously and did not remember being examined by a

6   consultative psychologist.    (AR 61-65.)    He has difficulties getting along with his live-in

7   caretakers, even though they "try real hard" to get along with him.  (AR 64.)   Plaintiff's

8   grandfather had passed away the year before, which is why his caretaker Tiffany had moved in

9   with him.  (AR 66.)

10      Plaintiff testified that he would be unable to work at a full-time job because he would

11  never remember to go to work at nine o'clock each morning, "would forget what I was doing so

12  they would just fire me," and "would hurt my boss if he yelled at me [and] I'm not very good with

13  people at all."  (AR 61.)  Plaintiff had not had a job since he was in high school when he worked

14  on cars; he didn't work at that job very long because his boss called him "retarded" and Plaintiff

15  "hit him."  (AR 66.)  Plaintiff did not think he would be able to work around people and testified

16  he "absolutely" could not stay focused long enough to work eight hour days.  (AR 68.)  Plaintiff

17  also thought his bipolar disorder "seems to be worse" as he gets older, "so [he] tr[ies] to stay away

18  from people."  (AR 70.)

19              **2.      Vocational Expert Testimony at Hearing**

20      The ALJ asked the Vocational Expert "VE" whether a hypothetical individual of Plaintiff's

21  age, education, and lack of any relevant past work experience "who does not have any exertional

22  limitations . . . who can have no more than rare, that would be 20 percent of the workday, no more

23  than rare face-to-face interaction with the general public, and likewise is no more than rarely able

24  to understand, remember and carry out complex and detailed job instructions, and would have . . .

25  some slight degree of limitation with respect to changes in the workplace" would be able to work.

26  (AR 69.)  The VE testified that such an individual would be able to perform the requirements of

27  representative occupations hand packer, Dictionary of Occupational Titles ("DOT") 920.587-018,

28  laborer stores, DOT 922.687-058, and cleaner II, DOT 919.687-014, all medium work with an

SVP[4] of 2.  (AR 69-70.)

**D.     Administrative Proceedings**

On July 25, 2013, the ALJ issued a written decision and found that Plaintiff had severe impairments of chronic intermittent explosive disorder, attention deficit hyperactivity disorder, mood disorder, psychiatric disorder, history of schizophrenia, and history of traumatic brain injury with cognitive impairment.  (AR 22.)  The ALJ determined that these impairments did not meet or equal a listed impairment.  (AR 22-23.)  The ALJ found that medical improvement had occurred as of November 1, 2010, because there had been a decrease in medical severity of the impairments present at the time of the comparison point decision ("CPD").  (AR 23.)

The ALJ found Plaintiff retained the residual functional capacity ("RFC") to

> . . . perform a wide range of work at all exertional levels but with the following nonexertional limitations:  He can have no more than rare, that is 20% of the work day, face-to-face interaction with the general public; [he] is no more than rarely able to understand, remember, and carry out complex and detailed job instructions although [her] can work in close proximity or along-side people without difficulty; and [her] would have a slight degree of limitation in adjusting to changes in the work place.

(AR 23.)

Plaintiff has no past relevant work, was a "younger individual age 18-49" as of November 1, 2010, has a high school education, and is able to communicate in English.  (AR 29.)  After considering Plaintiff's age, limited education, lack of transferable job skills, and RFC, the ALJ determined there were jobs existing in significant numbers in the national economy Plaintiff could perform, including representative occupations hand packer, DOT 920.587-018, laborer, DOT 922.687-058, and cleaner II, DOT 919.687-014, all medium work with an SVP of 2.  (AR 29-30.) The ALJ therefore concluded that Plaintiff's disability had ended as of November 1, 2010, and that Plaintiff had not become disabled again since that date.  (AR 30.)

The Appeals Council denied Plaintiff's request for review on January 28, 2015, making the ALJ's decision the Commissioner's final determination for purposes of judicial review.  (AR 1-7.)

---

[4]   Specific Vocational Preparation ("SVP"), as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.

**E.      Plaintiff's Complaint**

On April 3, 2015, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision.  (Doc. 1.)  Plaintiff argues that the ALJ erred in finding Plaintiff's mental impairment had medically improved and that he was no longer disabled as of November 10, 2010.  (Docs. 14; 24.)

### III.   SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

### IV.   APPLICABLE LAW

An individual is "disabled" for the purpose of receiving benefits under the Act if she is unable to engage in any substantial gainful activity due to an impairment which has lasted, or is expected to last, for a continuous period of at least twelve months.  42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a).  "Once a claimant has been found to be disabled, . . . a presumption of continuing disability arises in her favor[, and the Commissioner] bears the burden of producing evidence sufficient to rebut this presumption of continuing disability." *Bellamy v. Sec'y of Health*

& *Human Serv.*, 755 F.2d 1380, 1381 (9th Cir. 1985); *see also Murray v. Heckler*, 722 F.2d 499, 500 (9th Cir. 1983) (disability benefits cannot be terminated without evidence of improvement which is reviewed under the substantial evidence standard).   A recipient whose condition has improved medically so that she is able to engage in substantial gainful activity is no longer disabled.   42 U.S.C. § 1382c(a)(4); 20 C.F.R § 416.994; *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1459 (9th Cir. 1995). A medical improvement is:

> [A]ny decrease in the medical severity of [a recipient's] impairment(s) which was present at the time of the most recent favorable medical decision that [the recipient was] disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the recipient's] impairment(s)....

20 C.F.R. § 416.994(b)(1)(I), (2)(I).

The ALJ must apply and follow the seven-step evaluation process set forth in 20 CFR § 416.994 to determine if a claimant continues to be disabled.   At step one, the ALJ must determine whether the claimant has an impairment or combination of impairments that meets or medically equals the criteria of a listed impairment.  If the claimant does, her disability continues. At step two, the ALJ must determine whether medical improvement has occurred.   If medical improvement has occurred, the analysis proceeds to the third step.   If not, the analysis proceeds to the fourth step.

At step three, the ALJ must determine whether medical improvement is related to the ability to work.  Medical improvement is related to the ability to work if it results in an increase in the claimant's capacity to perform basic work activities.   If it does, the analysis proceeds to the fifth step.

At step four, the ALJ must determine if an exception to medical improvements applies. There are two groups of exceptions.   If one of the first group exceptions applies, the analysis proceeds to the next step.   If one of the second group exceptions applies, the claimant's disability ends. If none apply the claimant's disability continues.

At step five, the ALJ must determine whether all the claimant's current impairments in combination are severe.   If all current impairments in combination do not significantly limit the

1   claimant's ability to do basic work activities, the claimant is no longer disabled.  If they do, the

2   analysis proceeds to step six.

3         At step six, the ALJ must assess the claimant's residual functional capacity based on the

4   current impairments and determine if she can perform past relevant work.  If the claimant has the

5   capacity to perform past relevant work, her disability has ended.  If not, the analysis proceeds to

6   step seven.

7         At step seven, the ALJ must determine whether other work exists that the claimant can

8   perform, given her residual functional capacity and considering her age, education, and past work

9   experience.  If the claimant can perform other work, she is no longer disabled.  If the claimant

10  cannot perform other work, her disability continues.   In order to support a finding that an

11  individual is not disabled at this step, the Social Security Administration is responsible for

12  providing evidence that demonstrates that other work exists in significant numbers in the national

13  economy that the claimant can do, given her residual functional capacity, age, education, and work

14  experience.

15                              **IV.    DISCUSSION**

16        Plaintiff contends the ALJ erred by finding Plaintiff's mental impairment no longer

17  disabling as of November 1, 2010.  (Docs. 14; 24.)  The Commissioner asserts that substantial

18  evidence supports the ALJ's finding that Plaintiff experienced medical improvement and his

19  disability ceased as of November 1, 2010.  (Doc. 21.)

20        Specifically, the ALJ determined that as of November 1, 2010, Plaintiff could work in

21  close proximity or along-side people without difficulty; rarely interact with the general public;

22  rarely understand, remember, and carry out complex and detailed job instructions; and would have

23  a "slight degree of limitation in adjusting to changes in the workplace."  (AR 23.)  According to

24  the VE testimony, a person with these limitations would be able to work.  (AR 69.)  The ALJ

25  concluded Plaintiff was unable to perform any work from August 17, 2004, through October 31,

26  2010, but on November 1, 2010, medical improvement occurred such that Plaintiff's disability

27  ended.

28  //

1  **A.     Legal Standard**

2         Once a claimant is found to be disabled, cessation of disability may only be assessed

3  following an eight-step sequential evaluation process.  20 C.F.R. § 404.1594(f).  The eight-step

4  analysis is as follows:   (1) if a claimant is currently engaged in substantial gainful activity,

5  disability has ended; (2) if not, and the claimant meets a Listing, then disability continues; (3) if

6  the claimant does not meet or equal a listing, the ALJ will determine whether medical

7  improvement has occurred (an increase in the claimant's RFC assessment); (5) if no medical

8  improvement -- or no improvement related to the ability to work has occurred -- disability

9  continues, unless certain exceptions apply (20 C.F.R. §§ 404.1594(d)-(e), (f)(5)); (6) if there has

10 been medical improvement related to the claimant's ability to work, the ALJ will determine

11 whether *all* the current impairments, in combination, are "severe," and if not, disability ends; (7) if

12 the claimant meets the "severity" criteria, the ALJ will determine the current RFC and if the

13 claimant is able to do past relevant work, disability ends; (8) if the claimant remains unable to do

14 past work, the ALJ will determine whether the claimant can perform other work, given his RFC,

15 age, education, and past work experience -- if so, disability ends, and if not, then disability

16 continues.

17        "Medical improvement" is defined under the regulations as

18        . . . any decrease in the medical severity of [a claimant's] impairment(s) which was
          present at the time of the most recent favorable medical decision that you were
19        disabled or continued to be disabled.  A determination that there has been a
          decrease in medical severity must be based on changes (improvement) in the
20        symptoms, signs and/or laboratory findings associated with your impairment(s)
          (see § 404.1528).
21

22 20 C.F.R. § 404.1594(b)(1).  Once a claimant has been found disabled under the Act, there is a

23 rebuttable presumption of continuing disability.  *See Murray v. Heckler*, 722 F.3d 499, 500 (9th

24 Cir. 2000).  The Commissioner must produce evidence sufficient to make a "clear showing of

25 improvement in [a claimant's] symptoms" to overcome the presumption of continuing disability.

26 *Bellamy v. Sec'y of Health & Hum. Servs.*, 755 F.2d 1380, 1381 (9th Cir. 1985).   Medical

27 improvement is a term of art which refers to the "medical severity" of the impairments previously

28 found disabling based *solely* on medical evidence consisting of "symptoms, signs and/or

laboratory findings associated with those impairments." *Anderson v. Astrue*, 2008 WL 4500882, (C.D. Cal. Oct. 6, 2008) (quoting 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(I)); *see also Threet v. Barnhart*, 353 F.3d 1185, 1190 n.7 (10th Cir. 2003) (error for ALJ to base finding of medical improvement on rejection of claimant's statement of daily activities and a lack of medical attention).

## B.      The ALJ Erred in Discrediting Dr. Mulert's Opinion

In December 2012, treating physician Dr. Mulert diagnosed Plaintiff with paranoid schizophrenia, intermittent explosive disorder, and traumatic brain injury.  (AR 573.)  The ALJ rejected Dr. Mulert's September 2013 single-page opinion that Plaintiff had "extreme" limitations in his ability to withstand the stress and pressures of an eight-hour workday and maintain concentration in at least two-hour increments and assessment of GAF scores of 39 and 40 (AR 513; 573; 575) because

> . . . Dr. Mulert's opinions provide little in the way of analysis or explanation and fail to identify documentation in the objective medical evidence of record to support them.  Moreover, Dr. Mulert's opinion is not consistent with his own treatment notes.  For example, Dr. Mulert noted a [GAF] of 39. . . .  However, Dr. Mulert noted that in mental status examination, [Plaintiff] was dressed and groomed appropriately, had acceptable hygiene, had cooperative attitude, and had motor activity free of any movement disorder.  Finally, the opinion is not supported by the longitudinal evidence of record and noted activities of daily living, . . . , and is contradicted by the opinions of other medical experts[.]

(AR 28-29.)

While the ALJ is entitled to weigh contradictory medical opinions and resolve any ambiguities in the evidence, the ALJ is not permitted to interpret the treating physician's records and substitute his own opinion for that of the treating physician.  *Jenkins v. Astrue*, 628 F. Supp. 2d 1140, 1149 (C.D. Cal. 2009) ("It is axiomatic that as a treating physician and a specialist in orthopedics, [the treating physician]'s interpretation of her objective and clinical findings trumps a contrary interpretation based on nothing more than the ALJ's conflicting view of their significance").  The Commissioner contends the ALJ properly rejected Dr. Mulert's conclusory September 2013 opinion because it was provided in a simple one-page form without further explanation or discussion.  (Doc. 21, p. 11.)  However, the ALJ did not explain how Dr. Mulert's

1 clinical findings failed to support his opinion of "extreme limitations" to Plaintiff's ability to

2 maintain concentration or withstand pressures and stress in the workplace.  Although Dr. Mulert

3 noted Plaintiff was appropriately groomed and dressed, had acceptable hygiene, was cooperative,

4 and had motor activity free of any movement disorder in mental status examination (AR 29; *see*

5 AR 510), he also observed Plaintiff's flat and restricted affect, poverty of speech and thought, and

6 impaired cognition, insight, and judgment, even while compliant with medication (*see* AR 573).

7 *See Garrison v. Colvin*, 759 F.3d 995, 1013 (9th Cir. 2014).

8     As noted by the ALJ: "A GAF score of 31-40 indicates some impairment in reality testing

9 or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in

10 several areas, such as work or school, family relations, judgment, thinking, or mood (e.g.,

11 depressed man avoids friends, neglects family, and is unable to work; child frequently beats up

12 younger children, is defiant at home, and is failing at school)."  (AR 28-29 (citing DSM, at 34).)

13 Dr. Mulert's observations of Plaintiff's deficient affect, speech and though, and cognition,

14 judgment, and insight are *not* inconsistent with his opined GAF scores of 39 and 40.

15     The ALJ's selective reliance on Dr. Mulert's notes regarding Plaintiff's physical

16 appearance in a controlled, clinical setting where Plaintiff experienced limited stressors and was

17 supported by his caretakers is insufficient to demonstrate Plaintiff's medical improvement to a

18 point where he could be expected to perform or function in a workplace.  *See Garrison*, 759 F.3d

19 at 1017 (notations of improvement "must also be interpreted with an awareness that improved

20 functioning while being treated and while limiting environmental stressors does not always mean

21 that a claimant can function effectively in a workplace").  Moreover, the Court is unable to

22 decipher how Plaintiff's normal grooming, hygiene, attitude, and motor activity on mental status

23 exam contradict Dr. Mulert's opinion as to Plaintiff's "extreme" limitations in his ability to

24 withstand pressure and stress or concentrate for at least two hours at a time or assessment of GAF

25 scores of 39 and 40.

26     It is also unclear to what extent Dr. Mulert's opinion is contradicted by Plaintiff's admitted

27 activities of daily living.  The ALJ provided no specific examples of any activity that contradicted

28 Dr. Mulert's opinion as to Plaintiff's "extreme" limitations in his ability to withstand the stress

and pressures of an eight-hour workday and maintain concentration in at least two-hour increments (*see* AR 29).  *See* SSR 85-15 (noting that a claimant's "reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances" and that because "[i]ndividuals with mental disorders often adopt a highly restricted and/or inflexible lifestyle within which they appear to function well" it is possible that an apparently functional individual will "cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day"); *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) (a treating physician's "statements must be read in context of the overall diagnostic picture he draws. That a person who suffers from [mental impairments] makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace"). *See also Pinto v. Massanari*, 249 F.3d 840, 847-48 (9th Cir. 2001) (an agency decision cannot be affirmed based on a ground that the agency did not invoke in making its decision).

It is unclear from a review of the record how any of Plaintiff's admitted activities, which include spending the vast majority of his day watching television, waiting for his caretaker to make him food, and going for walks with his family members or caretaker (AR 285), actually contradict Dr. Mulert's opinion.  Plaintiff does not cook, clean, or perform household tasks, has trouble concentrating, remembering, and getting along with others, and only rarely leaves his house.  (AR 29.)  Such limited activities are not inconsistent with Dr. Mulert's opinion that Plaintiff is "extremely" limited in his ability to complete a full workday and maintain attention for at least two hours.

The ALJ also discredited Dr. Mulert's opinion as "contradicted by the opinions of other medical experts."  (AR 29.)  "This merely states a fact and does not explain -- specifically and legitimately or otherwise -- how that fact leads to the conclusion that Dr. [Mulert]'s evaluation should be disregarded."  *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006).  The ALJ's conclusory statement that Dr. Mulert's opinion was "contradicted" is not sufficiently specific to enable this Court to find that Dr. Mulert's opinion was not arbitrarily discredited.

//

Finally, the Commissioner's post-hoc explanation that Plaintiff's "significant improvement from medication" contradicts Dr. Mulert's opinion is unpersuasive.  (Doc. 21, p. 13 (citing *Warre v. Commissioner of Soc. Sec.*, 439 F.3d 1001, 1006 (9th Cir. 2006).)  The ALJ did not rely on Plaintiff's response to or compliance with medication in discrediting Dr. Mulert's opinion, and this Court may not affirm the ALJ's decision on a ground not invoked in making the decision.  *Pinto*, 249 F.3d at 847-48.

In sum, the ALJ erred by rejecting Dr. Mulert's opinion.

## C.   The ALJ's Finding of Medical Improvement is Not Supported by Substantial Evidence

The ALJ found that because "the objective medical evidence of record fails to show medical findings that are the same or equivalent to those of any listed impairment," Plaintiff's impairments did not meet or equal the criteria of any Listing as of November 1, 2010.  (AR 22.) Plaintiff contends the ALJ erred by finding Plaintiff had medically improved as of the November 2010 cessation date.  (Doc. 14, pp. 11-16; *see* AR 25-29.)

When considering symptoms of mental disorders, "[r]eports of 'improvement' in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and nature of [his] symptoms."  *Garrison*, 759 F.3d at1017.  Mental health treatment notes must be "interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean the claimant can function effectively in the workplace."  *Id.*  Exercising "caution" in inferring from treatment notes that a claimant is able to work is "especially appropriate when no doctor or other medical expert has opined, on the basis of a full review of all relevant records, that a mental health patient is capable of working or is prepared to return to work."  *Id.*

On October 2, 2010, examining physician Dr. Castillo opined he was unable to diagnose Plaintiff with schizophrenia or bipolar disorder because of Plaintiff's marijuana use.  (AR 447.) He diagnosed Plaintiff with mood disorder, psychotic disorder, and cannabis dependence, and predicted Plaintiff's symptoms would resolve if properly treated.  (AR 447.)  On May 3, 2011, examining physician Dr. Wakefield opined Plaintiff "does not appear to have an organic mental

1   disorder or a psychotic disorder," but cautioned that Plaintiff's malingering "may have obscured a

2   genuine disability." (AR 536.) Dr. Wakefield further opined that Plaintiff could follow simple

3   repetitive tasks; was impaired in his ability to make occupational, personal, and social decisions in

4   his best interests; and could acceptably interact with co-workers, supervisors, and the public. (AR

5   537.)

6          Two reviewing psychiatrists opined they were unable to determine whether medical

7   improvement had occurred based on the longitudinal medical record. (AR 461; 548.) Dr. Ikawa

8   did not assess Plaintiff's social functioning (*see* AR 457), and Dr. Meenasshi assessed only mild

9   limitations in Plaintiff's social functioning (*see* AR 546).   Treating physician Dr. Mulert

10  diagnosed Plaintiff with paranoid schizophrenia, intermittent explosive disorder, and traumatic

11  brain injury, and opined that Plaintiff had "extreme" limitations in his ability to withstand the

12  stress and pressures of an eight-hour workday and maintain concentration in at least two-hour

13  increments and assessment of GAF scores of 39 and 40. (AR 513; 573; 575.)

14         To be upheld, the ALJ's decision that there has been medical improvement must be

15  supported by substantial evidence.   *See* 20 C.F.R. § 416.994(b)(1)(i).   Because Dr. Mulert's

16  opinion, when accorded full weight, indicates that Plaintiff is "extremely" limited in his ability to

17  withstand the pressures and stress of an eight-hour workday or maintain concentration in at least

18  two-hour increments, reconsideration is necessary to reevaluate the credited medical evidence to

19  determine whether Plaintiff has indeed medically improved to the point where he can work.

20         As explained by the Commissioner: "In the case of disability cessation, the salient issue is

21  whether a claimant has experienced medical improvement related to the ability to work, and

22  whether that medical improvement allows the claimant to perform either his past relevant work or

23  other work existing in significant numbers. (Doc. 21, p. 9.) *See* 20 C.F.R. §§ 404.1594(b)(1)(i)

24  (defining medical improvement), (iii) (discussing the steps for evaluating cessation of disability),

25  416.994(b)(1)(i), (iii) (defining medical improvement), (b)(4)(v) (discussing the steps for

26  evaluating cessation of disability).)  Here, substantial evidence exists in the record to create a

27  question as to whether Plaintiff has not sufficiently medically improved so that he is able to

28  engage in substantial gainful activity. *See* 42 U.S.C. § 1382c(a)(4); 20 C.F.R. § 416.994; *Flaten*,

1    44 F.3d at 1459.

2    **D.      Remand for Reconsideration, Rather than Award of Benefits, is Appropriate**

3          The Court may remand this case "either for additional evidence and findings or to award

4    benefits." *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996).   Generally, when the Court

5    reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the

6    agency for additional investigation or explanation." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th

7    Cir. 2004) (citations omitted).   Thus, it is "the unusual case in which it is clear from the record that

8    the claimant is unable to perform gainful employment in the national economy" and that "remand

9    for an immediate award of benefits is appropriate." *Id.*; *see also Harman v. Apfel*, 211 F.3d 1172,

10   1179 (9th Cir. 2000) (noting that the decision whether to remand for further proceedings or for the

11   immediate calculation and payment of benefits generally turns on the likely utility of further

12   proceedings); *Benecke*, 379 F.3d at 593 noting that a remand for further proceedings is appropriate

13   "if enhancement of the record would be useful").

14         The Ninth Circuit has held that "[b]enefits wrongfully terminated should be reinstated

15   without further agency proceedings," *Iida v. Heckler*, 705 F.2d 363, 365 (9th Cir. 1983); however,

16   "[a]t this stage of the proceedings, it is not this Court's duty to resolve the conflicting opinions and

17   ultimately decide whether [Plaintiff] is once-and-for-all disabled as that term is used within the

18   Social Security regulations," *Nowlin v. Commissioner, Soc. Sec. Admin.*, No. CV 08-00209-N-

19   REB, 2009 WL 700128, at *7 (D. Idaho Mar. 16, 2009).

20         Here, it is not clear that the ALJ would have to award benefits were the case remanded for

21   further proceedings.   *Harman*, 211 F.3d at 1178, n.2.   Although the medical record in this case

22   reflects some level of improvement has taken place in Plaintiff's mental health and functioning

23   after November 1, 2010, when considered in combination with the other probative, competent

24   medical evidence, Dr. Mulert's fully-credited opinion as to Plaintiff's ability to concentrate and

25   deal with stress and change may direct a finding that medical improvement has not occurred.   As a

26   result, remand is appropriate in this *very limited respect* to allow the ALJ the opportunity to

27   reconsider the evidence supporting his finding of medical improvement.   *See* 20 C.F.R.

28   § 404.1594(c)(1) and (f) (medical improvement is "determined by a comparison of prior and

current medical evidence which must show that there have been changes (improvement) in the symptoms, signs, or laboratory findings").

## VI.    CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, REVERSED and the case REMANDED to the ALJ for reconsideration. The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Donald Schneider and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.


IT IS SO ORDERED.

Dated:   **July 8, 2016**                          /s/ *Sheila K. Oberto*
                                              UNITED STATES MAGISTRATE JUDGE